## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BAKER HUGHES INCORPORATED | § | |
| and BAKER PETROLITE CORPORATION, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CASE NO. 1:14-cv-531 |
| | § | Hon. Robert Holmes Bell |
| S&S CHEMICAL, LLC, | § | |
| BRUCE NEAL STEVENS, and SPE WAX | § | |
| TECHNOLOGIES, LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT – RELEASE AGREEMENT

### *ORAL ARGUMENT REQUESTED*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

STATEMENT OF MATERIAL FACTS ................................................................. 2

LEGAL STANDARD ............................................................................................. 8

ARGUMENT AND AUTHORITIES ..................................................................... 9

    I.      Settlement Agreement Cannot Release Stevens Because It Is Not Signed. ........... 9

    II.     Settlement Agreement Is Not A Binding Contract. .............................................. 10

        A.     Missouri law applies to whether Settlement Agreement is binding. .............. 10

        B.     Settlement Agreement release is not binding because Plaintiffs
             did not assent ..................................................................................... 13

        C.     Subsequent conduct reveals that none of the parties believed that
             Stevens was released from his confidentiality obligations. ........................... 17

        D.     Defendants' "evidence" does not prove that Plaintiffs assented
             to a release .......................................................................................... 19

        E.     Settlement Agreement is invalid under the Statute of Frauds ....................... 21

    III.    Settlement Agreement Does Not Release Stevens Of Common Law Obligations. 22

    IV.    Court Should Strike And Disregard Giles Affidavits And Billing Records. ......... 24

CONCLUSION ...................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.B. Chance Co. v. Schmidt*,
    719 S.W.2d 854 (Mo. Ct. App. 1986)......................................................................23

*Alonzo v. Laubert*,
    418 S.W.2d 94 (Mo. 1967) ...............................................................................22

*Arndt v. Beardsley*,
    102 S.W.3d 572 (Mo. Ct. App. 2003)........................................................ 14-15, 20

*Baier v. Darden Restaurants*,
    420 S.W.3d 733 (Mo. Ct. App. 2014).......................................................... 14-16, 21

*Baylor Univ. v. Sonnichsen*,
    221 S.W.3d 632 (Tex. 2007)...............................................................................15

*Beck v. Reynolds*,
    903 P.2d 317 (Okla. 1995).................................................................................14

*In re Beyond the Arches, Inc.*,
    No. 09-04-126 CV, 2004 WL 1699900 (Tex. Ct. App. July 29, 2004)...................15

*Bird v. Bilby*,
    202 Mo. App. 212 (Mo. Ct. App. 1919) ...........................................................22

*Bookout v. Bookout*,
    165 S.W.3d 904 (Tex. Ct. App. 2005)...............................................................22

*Briggs v. Miles*,
    No. 1:13-cv-228, 2015 WL 1120132 (W.D. Mich. Mar. 12, 2015) (Neff, J.).........24

*In re Bunzl USA, Inc.*,
    155 S.W.3d 202 (Tex. Ct. App. 2004) ..........................................................15, 16

*Chrysler Corp. v. Skyline Indus. Servs., Inc.*,
    448 Mich. 113, 528 N.W.2d 698 (1995)...............................................................12

*Comm'l Standard Ins. Co. v. Garrett*,
    70 F.2d 969 (10th Cir. 1934) ...........................................................................15

*In re De-Annexation of Certain Real Prop. from City of Seminole*,
    204 P.3d 87 (Okla. 2009).................................................................................14

*Dunn Indus. Grp., Inc. v. City of Sugar Creek,*
    112 S.W.3d 421 (Mo. 2003) (en banc) ...................................................................9

*Hayes-Albion v. Kuberski,*
    421 Mich. 170, 364 N.W.2d 609 (1984)............................................................2324

*Johnson v. Cook,*
    167 S.W.3d 258 (Mo. Ct. App. 2005)..................................................................22

*Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.,*
    297 F. Supp. 2d 972 (W.D. Mich. 2004), *aff'd*, 409 F.3d 342 (6th Cir. 2005).................. 10-12

*Mill's Pride, Inc. v. Cont'l Ins. Co.,*
    300 F.3d 701 (6th Cir. 2002) ................................................................. 10, 12-13

*Palestine Water Well Servs., Inc. v. Vance Sand & Rock, Inc.,*
    188 S.W.3d 321 (Tex. Ct. App. 2006) ...............................................................14

*Polar Molecular Corp. v. Amway Corp.,*
    No. 1:07-CV-460, 2007 WL 3473112 (W.D. Mich. Nov. 14, 2007) (Bell, J.).........................9

*Pony Computer, Inc. v. Equus Computer Sys. of Mo., Inc.,*
    162 F.3d 991 (8th Cir. 1998) ...........................................................................24

*Queen Anne Candy Co. v. Eagle,*
    88 P.2d 630 (Okla. 1939)..................................................................................14

*Redwine Res., Inc. v. Predator Techs., LLC,*
    171 P.3d 330 (Okla. Ct. App. 2007) ............................................................ 20-21

*Russell v. Bd. of Cnty. Comm'rs of Carter Cnty.,*
    1 P.3d 442 (Okla. Ct. App. 2000) .....................................................................14

*Smith v. Worsham,*
    552 S.W.2d 367 (Mo. Ct. App. 1977)..............................................................15, 17

*Snepp v. United States,*
    444 U.S. 507 (1980)........................................................................................23

*Sticelber v. Iglehart,*
    37 P.2d 638 (Okla. 1934)..................................................................................14

*Sutherland v. Kennington Truck Serv., Ltd.,*
    454 Mich. 274, 562 N.W.2d 466 (1997)............................................................12

*Women's Care Specialists, LLC v. Troupin,*
    408 S.W.3d 310 (Mo. Ct. App. 2013)................................................................14

*Wright v. Hernandez*,
    No. 08-14-00303-CV, --- S.W.3d.---, 2015 WL 4389582 (Tex. Ct. App. July
    17, 2015) ..................................................................................................................17

**Statutes**

Mo. Ann. Stat. § 432.010 (2015)..............................................................................21

Mo. Ann. Stat. § 516.120 (2015)..............................................................................22

Ok. Stat. Ann. tit. 15, § 136 (2015) ..........................................................................21

Tex. Bus & Com. Code Ann. § 26.10 (2015) ...........................................................21

Defendants seek dismissal of Plaintiffs' breach of contract claim (Count II) and trade secrets misappropriation claim (Count I) on the theory that Plaintiffs released defendant Bruce Stevens ("Stevens") of his contractual confidentiality obligations to his former employer, Petrolite Corporation ("Petrolite"), in a draft settlement agreement that was never signed by Baker Hughes or Baker Petrolite. Defendants' motion should be denied because Stevens' confidentiality obligations have remained intact at all relevant times, and were not extinguished by the draft agreement that related to a $10,000 payment dispute.

*First*, Stevens' contractual confidentiality obligations arise under both his Employee Agreement and his Termination Agreement. Because the Employee Agreement expressly provides that Stevens' obligations survive termination, and that the agreement cannot be modified except in a writing signed by both parties, the unsigned draft Settlement Agreement has no effect on these contractual obligations.

*Second*, the draft Settlement Agreement is invalid and unenforceable because there is no evidence that Plaintiffs assented to, and intended to be bound by, the draft agreement (a necessary requirement in the formation of a contract). In fact, the overwhelming evidence establishes that neither Plaintiffs nor Stevens ever believed that the draft Settlement Agreement released Stevens' contractual confidentiality obligations. Moreover, the agreement is invalid under the Statute of Frauds because it is incapable of being performed within one year.

*Finally*, even if the Settlement Agreement discharged Stevens' obligations under his agreements (which is denied), it had no effect on Stevens' common law duty to maintain the trade secrets and confidential information of his employer. Because Stevens' duty to maintain Plaintiffs' trade secrets never lapsed or was released, Defendants' motion should be denied. At a minimum, disputed issues of material fact as to the parties' intent prohibit summary judgment.

## STATEMENT OF MATERIAL FACTS

1.      Baker Petrolite and its parent company, Baker Hughes (collectively, "Plaintiffs"), are engaged in the manufacture of petrochemicals. Baker Petrolite, formerly known as Petrolite Corporation, has manufactured polyethylenes, alcohols, and copolymers for over 40 years using ethylene polymerization processes that the company has maintained as trade secrets (the "EP Processes"). The EP Processes are used by Plaintiffs to produce POLYWAX™ and PERFORMALENE™ polyethylenes, UNILIN™ and PERFORAMCOL™ alcohols, and PETROLITE™ copolymers. Doc. No. 251 Woods Decl. at ¶¶ 1, 8, 18.

2.      Defendant Bruce Stevens was employed by Petrolite Corporation, Plaintiffs' predecessor-in-interest, from 1989 until 1996. Defs. Br. at § I, ¶ 1; Woods Decl. at ¶ 10. It was company policy at Petrolite that all employees sign written agreements to maintain the confidentiality of Petrolite's trade secret information. Woods Decl. at ¶ 17. On July 17, 1989, when he became employed at Petrolite, Stevens signed a confidentiality agreement in connection with his employment. *See* SS002816-21 ("Employee Agreement") (attached as Ex. A).

3.      At Petrolite, Stevens was provided with and was in charge of using extensive confidential, proprietary trade secret information concerning the EP Processes used by Petrolite in its business. Woods Decl. at ¶ 11. Stevens' original position at Petrolite was Product Research Manager with responsibilities that included managing the pilot plant in Kilgore, Texas and managing the main process technology group in the Special Polymers Division. *Id*. At the time of Stevens' employment, various research reports describing Petrolite's confidential and proprietary EP Processes were under Stevens' control. *Id*. Indeed, one of Stevens' initial work assignments was to write a study of Petrolite's copolymer processes, which required a comprehensive understanding of the EP Processes. *Id*. After a fire occurred at the Petrolite plant

that used the EP Processes, Stevens was the primary employee responsible for modifying the EP Processes. *Id.* Stevens admits he gained intimate knowledge of the EP Processes through his position within Petrolite, including the key chemical components used. Tr. of 05/27/15 Stevens Dep. at 55:19-56:23, 106:8-108:24 ( Ex. D to Pls. Opp. To Defs. Mot. for Summ. J. – No Trade Secrets or Misappropriation ("Opp. MSJ-TS")).

4.      Petrolite terminated Stevens' employment in 1996. Woods Decl. at ¶ 12. In connection with his acceptance of a severance package upon termination, Stevens signed another agreement on or about November 22, 1996, again acknowledging his confidentiality obligations and agreeing not to use the trade secrets of Petrolite (the "Termination Agreement"). *See* Defs. Ex. A; Woods Decl. at ¶ 12.

**The Employee Agreement and the Termination Agreement**

5.      Paragraph 3 of the Employee Agreement executed by Stevens in 1989 upon the commencement of his work at Petrolite obligates Stevens to "not disclose to others not in the employ of [Petrolite]," either during or subsequent to his employment, "any [confidential] information, knowledge, or data" he may have received, learned, obtained, or developed during the course of his employment that relate to Petrolite's business or technology. *See* Ex. A at ¶ 3(A). The Employee Agreement further provides that Stevens' non-disclosure obligations under Paragraph 3 survive termination of the agreement. *See id.* at ¶ 3(C). Paragraph 2 discusses Stevens' obligations with respect to the inventions, discoveries, and improvements he makes, conceives, or develops while in the employ of Petrolite, including his obligations to disclose them to Petrolite and to assist Petrolite during and subsequent to his employment to obtain patents or otherwise protect such inventions. *Id.* at ¶ 2. Paragraph 3(B) obligates Stevens to return confidential information to Petrolite upon termination. *Id.* at ¶ 3(B). Paragraph 4(A)

includes a non-compete provision restricting Stevens from certain activities post-termination. *Id.* at ¶ 4(A). Paragraph 6 obligates Stevens to provide certain services to Petrolite post-termination, if requested, at an agreed rate. *Id.* at ¶ 6. The Employee Agreement further provides that the agreement "may not be changed or modified, abandoned, in whole or in part, ***except in writing and signed by all parties to this Agreement***." *Id.* at ¶ 9 (emphasis added).

6.    In Stevens' 1996 Termination Agreement, he again agreed to not disclose to others not in the employ of Petrolite, either during or subsequent to his employment, any confidential information, knowledge, or data he may have received, learned, obtained, or developed during his employment that relate to Petrolite's business or technology. *See* Defs. Ex. A at ¶ 5; Woods Decl. at ¶ 12. Paragraph 4 of the Termination Agreement provides that the Termination Agreement "shall supersede any and all agreements (written or oral) which may exist between [Petrolite] and Stevens…, ***except as expressly set forth herein***." Defs. Ex. A at ¶ 4 (emphasis added). In Paragraph 6 of the Termination Agreement, Stevens expressly agrees that:

> Some employees have previously entered into written agreements with [Petrolite] which set forth specific obligations of the employee including the Disclosure and Processing of Inventions, the Possession and Surrender of Company Information, and certain actions by the Employee following his/her termination. In further consideration for the benefits received under this Program, [Stevens] agrees that ***nothing in this [Termination] Agreement alters [Stevens'] obligations contained in such prior agreements in any way***, and ***[Stevens] specifically reaffirms and restates all such obligations and/or agreements by [Stevens] in any Employee Agreement between [Petrolite] and [Stevens].***

*Id.* at ¶ 6 (emphasis added).

7.    The Employee Agreement and the Termination Agreement both specifically provide that they are governed by Missouri law. *See* Ex. A at ¶ 11; Defs. Ex. A at ¶ 9.

**The Oklahoma Bonus Litigation**

8.    Stevens filed a lawsuit against Baker Hughes, Incorporated d/b/a Baker Petrolite in Oklahoma state court alleging breach of contract for failure to pay Stevens a bonus in

connection with his Petrolite employee management compensation plan ("Bonus Lawsuit").
Defs. Ex. D. The Bonus Lawsuit contained no other claims for relief and made no mention of
any dispute regarding Stevens' ongoing duty of confidentiality. *See* Defs. Ex. D at ¶¶ 4-6. Baker
Hughes and Baker Petrolite removed the case to federal district court and filed a motion to
dismiss on the grounds that Stevens' breach of contract claim was preempted by federal law. *See*
Notice of Removal, *Stevens v. Baker Hughes Inc.*, Case No. 99-CV-1016 (N.D. Okla. Nov. 29,
1999) (attached as Ex. C); Defs. Mot. to Dismiss and Br. in Supp., Case No. 99-CV-1016 (N.D.
Okla. Dec. 21, 1999) (attached as Ex. D). Baker Hughes and Baker Petrolite did not file answers
or assert any counterclaims in the Oklahoma case. *See* Docket Report, Case No. 99-CV-1016
(N.D. Okla.) (attached as Ex. E).

9.      On or about April 4, 2000, a Baker Petrolite check in the amount of $10,000 was
provided to Stevens and his counsel. *See* Defs. Ex. I. Stevens's counsel moved to dismiss the
Bonus Lawsuit with prejudice on or about April 18, 2000. Agreed Mot. to Dismiss with
Prejudice, Case No. 99-CV-1016 (N.D. Okla. Apr. 19, 2000) (attached as Ex. F). The court
dismissed the case on or about April 19, 2000. Order Dismissing Case with Prejudice, Case No.
99-CV-1016 (N.D. Okla. Apr. 20, 2000) (attached as Ex. G).

**The Unexecuted and Non-Binding March 31, 2000 Settlement Agreement**

10.     There is an unexecuted (by Baker Hughes or Baker Petrolite) draft Settlement
Agreement related to the Bonus Lawsuit. The draft Settlement Agreement included signature
blocks for Stevens, Stevens' attorney (Robert W. Giles), Baker Petrolite Corporation, and Baker
Petrolite's attorney (Steven A. Broussard). *See* Defs. Ex. G at BHI014938. Although it was also
a named defendant in the Bonus Lawsuit and is referenced in the first paragraph of the draft
Settlement Agreement, there are no signature blocks on the draft for Baker Hughes Incorporated

or its counsel. *See id.* Indeed, while the draft Settlement Agreement contains a mutual release, the draft was only executed by Stevens and his attorney and not by Baker Hughes, Baker Petrolite or their counsel, and no documents or other evidence indicate that Baker Hughes, Baker Petrolite or their counsel ever agreed to a mutual release. *See id.* at BHI014934-39.

**Actions of Stevens and Plaintiffs Following Settlement Rebut Mutual Release**

11.     Stevens formed Defendant S&S Chemical LLC ("S&S") in 1999 and began producing a product named POLYBOOST. *See* Ex. D to Opp. MSJ-TS 14:21-25, 15:6-10, 21:8-9. POLYBOOST competed with Plaintiffs' VYBAR™ polymers, a fact Plaintiffs learned in the early 2000's. Tr. of 06/04/15 John H. Woods Dep. at 30:7-12 (attached as Ex. H). However, it is undisputed that the VYBAR™ product is not manufactured using the trade secret processes at issue in this case, but rather is manufactured pursuant to a different non-trade secret process. *See* Ex. D to Opp. MSJ-TS at 6:11-18, 15:6-22, 18:16-19; Ex. H at 34:9-24; Tr. of Stephen Littlefield Dep. at 62:23-64:17 (attached as Ex. I).[1]

12.     Although it was later confirmed that the process used to make POLYBOOST did not implicate Plaintiffs' trade secrets (*see id.*), Baker Hughes sent a letter to Stevens in an abundance of caution, on or about February 26, 2002, reminding him of his continuing confidentiality obligations:

> During your employment with Baker Petrolite Corporation (the "Company"), you had access to confidential information and trade secrets owned or possessed by the Company. This letter is meant to remind you that you are obligated to protect the confidentiality of this information even after your employment with the Company has ended.

Ex. 15 to Dep. of Sam Crowder (attached as Ex. L); *see* Ex. I at 77:9-18.

---

[1] Plaintiffs did not learn until 2005 that Stevens and S&S were selling the PRECISIONMELT product that competed with Plaintiffs' POLYWAX™ product. *See* Tr. of 06/30/15 John Woods Dep. at 10:14-11:9 (attached as Ex. J); Tr. of Vaughn Dep. at 79:4-24 (attached as Ex. K).

13.     In response to the 2002 letter, Stevens consulted with an attorney, Brent P. Johnson concerning his confidentiality obligations. *See* SS002513-49 (Ex. FF to Pls. Opp. To Defs. Mot. for Summ. J. – No Trade Secrets or Misappropriation). The detailed letter from Stevens makes no mention of the draft Settlement Agreement, or any purported release of the Employee Agreement, the Termination Agreement, or Stevens' confidentiality obligations. *See id.* Indeed, Stevens never claimed in response to Baker Hughes' 2002 letter that he had been released from his confidentiality obligations.

14.     In February 2008, Stevens entered into a sales transaction related to the technology that he and his company claimed to own. *See* Ex. CC, DD to Opp. MSJ-TS. Significantly, the sales documents evidence a potential claim by Baker Petrolite to ownership of the technology. Ex. DD to Opp. MSJ-TS at SS105062-63. The closing documents do not mention any release by Baker Petrolite of Stevens' confidentiality obligations. Stevens' failure to raise the important fact that the technology being sold was free and clear of competing ownership claims, evidences that Stevens did not believe that he had such a release. Indeed, it is not credible to suggest that there was a meeting of the minds and mutual assent between Baker Hughes, Baker Petrolite and Stevens to release claims regarding this technology. If there had been, Stevens certainly would have mentioned it in the sales documents, thereby gaining a significantly higher price for the company than he doubtless received for technology with the ownership in dispute.

15.     In 2013, Defendants began negotiating with a potential toll manufacturer. Ex. D to Opp. MSJ-TS at 184:19-185:1. The potential toller also raised questions about technology ownership. *See* Ex. HH to Opp. MSJ-TS at SS047826-27; Ex. II to Opp. MSJ-TS. Again, rather than asserting that the Settlement Agreement had released him of any confidentiality obligations,

Stevens never mentioned any settlement or release.

16.     Plaintiffs filed a discovery lawsuit in Texas state court seeking a pre-suit deposition in 2014. If Stevens believed that he had a release of any potential claims, he would have been expected to raise that defense immediately upon being served with the lawsuit. Instead, Stevens did not contend he had been released when he was sued in Texas. The state court suit resulted in an agreement whereby Defendants agreed to reveal their alleged trade secret process on March 5, 2014 to an expert hired by Plaintiffs, Dr. David Bergbreiter of Texas A&M University, who would compare each side's processes and determine if they were the same. *See* Doc. No. 9-2 at ¶ 3 (Bergbreiter Aff.); Ex. D to Opp. MSJ-TS at 218:2-17. After meeting with each side and also with a representative of KMCO in March and April of 2014, Bergbreiter determined that the process Stevens and S&S had sold to SPE was the same in all material respects to Plaintiffs' process. Bergbreiter Aff. at ¶ 3. At no time, prior, during, or after the meeting with Bergbreiter, did Stevens ever contend that he had been released from any claim to the disputed technology.

17.     Indeed, Defendants first raised the alleged release as an affirmative defense in this case on or about May 11, 2015 – fifteen months after the meeting with Bergbreiter – when responding to the Second Amended Complaint. *Compare* Doc. No. 56 (release is not listed as an affirmative defense), *with* Doc. No. 96 (including the affirmative defense of release). Clearly, the foregoing evidence demonstrates that disputed issues of material fact exist regarding the parties' intent concerning the alleged release that preclude resolution on summary judgment.

## LEGAL STANDARD

Summary judgment may be appropriate only when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "[T]he court must construe the evidence and draw all

reasonable inferences in favor of the nonmoving party." *Polar Molecular Corp. v. Amway Corp.*, No. 1:07-CV-460, 2007 WL 3473112, at *9 (W.D. Mich. Nov. 14, 2007) (Bell, J.) (Ex. B).

## ARGUMENT AND AUTHORITIES

### I.   Settlement Agreement Cannot Release Stevens Because It Is Not Signed.

Stevens' employment relationship with Petrolite was governed by his Employee Agreement and his Termination Agreement. The Employee Agreement expressly provides that it is governed by Missouri law. SOF 7. According to Missouri law, a contract must be interpreted according to its plain and ordinary meaning. *See Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003) (en banc). Stevens' Employee Agreement expressly provides that he must maintain the confidentiality of Plaintiffs' confidential and trade secret information. SOF 2, 5. Stevens affirmed these confidentiality obligations in the Termination Agreement. SOF 4, 6.

The Settlement Agreement does not – and cannot –release Stevens' obligations under the Employee Agreement because the Settlement Agreement was not signed by both Stevens and Petrolite (or its successor) as required by the Employee Agreement. The Employee Agreement states that Stevens' non-disclosure obligations survive and continue in full force after termination, and that the agreement "may not be changed or modified, [or] abandoned, in whole or in part, ***except in writing and signed by all parties to this Agreement***." SOF 5 (emphasis added).

Defendants contend that the Termination Agreement superseded the Employee Agreement, but that is incorrect. In fact, by its express terms, the Termination Agreement ***does not*** supersede the Employee Agreement. Paragraph 6 of the Termination Agreement expressly provides that "***nothing in this Agreement alters [Stevens'] obligations contained in such prior***

[employment] **agreements in any way**," and "**specifically reaffirms and restates all such obligations and/or agreements** by [Stevens] in any Employee Agreement between [Petrolite] and [Stevens]." SOF 6 (emphases added). Thus, the Employee Agreement remained in full force and effect following execution of the Termination Agreement.

## II.   Settlement Agreement Is Not A Binding Contract.

### A.   Missouri law applies to whether Settlement Agreement is binding.

A federal court presiding over a diversity action must apply the substantive law of the state in which the court sits, including that state's choice of law rules. *See Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002). In cases involving contract disputes, Michigan courts "examine the factors articulated in sections 187 and 188 [of] the Second Restatement … so as to balance 'the expectations of the parties to a contract with the interests of the states involved.'" *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 297 F. Supp. 2d 972, 977 (W.D. Mich. 2004), *aff'd*, 409 F.3d 342 (6th Cir. 2005).

Section 188 of the Second Restatement provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."[2] Restatement (Second) of Conflict of Laws § 188 (2015) ("Second Restatement"); *Meridian*, 297 F. Supp. 2d at 977-78. Under Section 6, a court will generally follow a statutory directive of its own state on choice of law. *See* Second Restatement § 6. When there is no such directive, however, the factors relevant to the choice of law include:

(a) the needs of the interstate and international systems,

---

[2] Section 187 of the Second Restatement addresses the validity of a contractual choice of law provision. However, because the Settlement Agreement itself does not contain a choice of law provision, *see* Defs. Ex. G, Section 187 is inapplicable to the Settlement Agreement.

(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Id.*; *Meridian*, 297 F. Supp. 2d at 977-78.

When the relevant factors are considered, it is clear that Missouri law has the most significant relationship to this dispute. The dispute on which the alleged Settlement Agreement is based relates to non-payment of a bonus allegedly owed to Stevens in connection with his employment. Both the Employee Agreement and the Termination Agreement expressly provide that they are governed by Missouri law. SOF 7. Further, under the Termination Agreement, Stevens and Petrolite expressly agreed that Missouri law would control any post-termination disputes concerning employment:

8. Both parties agree that … any future dispute which hereinafter arises with respect to i) Employee's employment by the Company, ii) Employee's termination, or iii) the terms of this Agreement ***shall be resolved solely in accord with the terms and provisions of this Agreement***.

9. ***This Agreement is subject to***, and shall be construed according to, ***the laws of the State of Missouri***.

Defs. Ex. A ¶¶ 8-9 (emphases added); *see also* Ex. D to Opp. MSJ-TS 86:1-7. Thus, applying Missouri law to this dispute will best give effect to the parties' ***express*** intentions in the Termination Agreement. The parties' reliance on Missouri law was reasonable – Petrolite's corporate headquarters were located in Missouri at the time the parties entered into the Termination Agreement and during the course of Stevens' seven years of employment, and the parties had previously agreed in the Employee Agreement that Missouri law governed their relationship. Woods Decl. ¶ 10. Thus, Missouri has a substantial interest in its law being applied to the Settlement Agreement, particularly where the parties have expressly agreed it should

- 11 -

control such disputes. *See Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 126, 528 N.W.2d 698, 703 (1995) (reversing lower court's selection of another forum's law where the court "gave insufficient weight to the effective choice of law made by the contracting parties….").

Oklahoma, in contrast, does not have a similarly significant relationship with or connection to the parties or the underlying dispute. In attempting to justify the application of Oklahoma law, Defendants cite only facts that directly arise out of Stevens' decision to file suit in Oklahoma because he resided there. Defs. Br. 8-9. These Oklahoma contacts are insufficient to trump the parties' prior express contractual agreement that Missouri law applies to all post-termination employment disputes. *See Meridian*, 297 F. Supp. 2d at 977-78; *cf. Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 287, 562 N.W.2d 466, 472 (1997) (residence of the parties, "with nothing more, is insufficient to support the choice of a state's law").

The relationship of Texas with this dispute is greater than or equivalent to that of Oklahoma. Baker Hughes' headquarters and principal place of business is in Texas and was at the time that the Oklahoma Bonus Lawsuit was filed. Woods Decl. ¶¶ 10, 12. Indeed, the Oklahoma Bonus Lawsuit was removed by Baker Hughes to federal court because of the diversity of citizenship. *See* Ex. C. Moreover, Stevens resided in Texas for at least some portion of his employment with Petrolite. Woods Decl. ¶ 10.

Allowing the choice of law to turn on where a single employee such as Stevens decides to live and file suit will significantly undermine the justifiable expectation of Petrolite and its successor-in-interest, Baker Hughes, that the law of a single forum (Missouri) shall govern the interpretation of its employment agreements. *See Mill's Pride, Inc. v. Cont'l Ins.. Co.*, 300 F.3d 701, 710-11 (6th Cir. 2002). It will also potentially undermine the predictability and uniformity

of the interpretation of such employment agreements, if they will be subjected to the laws of multiple jurisdictions. *See id*. Accordingly, because Missouri has the most significant relationship to all of the relevant agreements at issue, Missouri law should control.

Notwithstanding the applicability of Missouri law, for purposes of this brief, Plaintiffs will cite Missouri, Oklahoma, and Texas law, since Oklahoma and Texas were cited by Defendants. These laws have similar requirements with respect to contract interpretation and formation, and therefore, the outcome is the same, regardless of which state's laws apply.

### B.    Settlement Agreement release is not binding because Plaintiffs did not assent.

The Settlement Agreement is not a binding contract because there is no evidence that Petrolite ever assented to its terms – an essential element to the formation of a contract under Missouri, Oklahoma, or Texas law. There is also no evidence apart from the signatures on the draft agreement as to Stevens' own intent. Defendants did not attach an affidavit from Stevens to their motion concerning his intent. Indeed, when questioned regarding his understanding of the alleged deal in his deposition, Stevens testified that he had no recollection. Ex. D to Opp. MSJ-TS 91:13-95:11. The Giles Affidavit Defendants submit in support of their motion is notably silent on intent.[3] Defs. Ex. B; Doc. No. 238. Thus, in the absence of a signed agreement or any other evidence of mutual assent to all of the terms of the alleged Settlement Agreement, including the release, there is at least a disputed issue of material fact regarding intent that should be submitted to the jury and that is not amenable to determination on summary judgment.

Settlement agreements are contracts that must have all the essential elements of a contract to be enforceable. *See Women's Care Specialists, LLC v. Troupin*, 408 S.W.3d 310, 315 (Mo. Ct.

---

[3] Plaintiffs move to strike the two Giles Affidavits and the attached billing records, as set forth more fully in Section IV below.

App. 2013); *Russell v. Bd. of Cnty. Comm'rs of Carter Cnty.*, 1 P.3d 442, 443 (Okla. Ct. App. 2000). Missouri, Oklahoma, and Texas law all recognize "mutuality of agreement" (or "mutual assent") is one such essential element. *See Women's Care*, 408 S.W.3d at 315; *In re De-Annexation of Certain Real Prop. from City of Seminole*, 204 P.3d 87, 89 (Okla. 2009) ("Consent of the parties to a contract must be … Mutual … and Communicated by each to the other."); *Palestine Water Well Servs., Inc. v. Vance Sand & Rock, Inc.*, 188 S.W.3d 321, 325 (Tex. Ct. App. 2006); *see also Sticelber v. Iglehart*, 37 P.2d 638, 639 (Okla. 1934) ("No contract is complete without the mutual assent of all of the parties to all of its terms.").

"Mutuality of agreement" implies a mutuality of assent by the parties to the terms of the contract, *i.e.*, a meeting of the minds. *See Women's Care*, 408 S.W.3d at 315-17; *Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995); *Palestine Water*, 188 S.W.3d at 325. "A mutual agreement is reached when the 'minds of the contracting parties meet upon and assent to the same thing in the same sense at the same time.'" *Baier v. Darden Restaurants*, 420 S.W.3d 733, 738 (Mo. Ct. App. 2014) (quoting *Kunzie v. Jack-In-The-Box, Inc.,* 330 S.W.3d 476, 483 (Mo. Ct. App. 2010)); *Beck*, 903 P.2d at 319. Whether there was a meeting of the minds is a ***question of fact***. *See Women's Care*, 408 S.W.3d at 316. In determining whether there has been mutuality of assent, a court looks to the parties' intentions as expressed or manifested in their words or acts. *See id.*; *Queen Anne Candy Co. v. Eagle*, 88 P.2d 630, 631-32 (Okla. 1939); *Palestine Water*, 188 S.W.3d at 325. "Contract formation depends on what is actually said and done, not upon the understanding or supposition of one of the parties." *Arndt v. Beardsley*, 102 S.W.3d 572, 575 (Mo. Ct. App. 2003).

There is no evidence demonstrating that Plaintiffs ever agreed to the terms of the draft settlement agreement, let alone the language of the release. Indeed, the fax coversheet attached

as Ex. A to the Giles Affidavit shows only that a version of the draft agreement may have been transmitted from Baker Petrolite's outside counsel, Steven Broussard, to Baker Petrolite's in-house counsel, Jeff Shank, on or about April 7, 2000. Doc. No. 238 p. 7. It does not show that Baker Hughes or Baker Petrolite had in fact assented to its terms or even that Baker Petrolite's counsel faxed this version of the document to Stevens' counsel on March 30, 2000. *Id.* In fact, it is undisputed that Baker Hughes, Baker Petrolite, and/or their attorney did not execute the Settlement Agreement.[4] SOF 10. The absence of their respective signatures on the agreement is significant because it evidences that Baker Hughes, Baker Petrolite and their attorney ***did not*** assent to the terms of the Settlement Agreement. *See Baier*, 420 S.W.3d at 738 ("A party's signature on a contract remains the 'common, though not exclusive, method of demonstrating agreement.'"); *Comm'l Standard Ins. Co. v. Garrett*, 70 F.2d 969, 974 (10th Cir. 1934) ("Ordinarily the purpose of a signature to a written contract is to show consent to be bound thereby. It is the customary way of manifesting assent to a written instrument."); *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. Ct. App. 2004) ("[A] party's signature on a written contract is 'strong evidence' that the party unconditionally assented to its terms."); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 634 (Tex. 2007). "[T]he object of a signature is to show mutuality of assent." *Smith v. Worsham*, 552 S.W.2d 367, 373 (Mo. Ct. App. 1977).

In the absence of Plaintiffs' signatures, or any other evidence of assent, Defendants cannot carry their burden on summary judgment. *See Baier*, 420 S.W.3d at 738; *In re Beyond the Arches, Inc.*, No. 09-04-126 CV, 2004 WL 1699900, at *5 (Tex. Ct. App. July 29, 2004) (attached as Ex. M); *In re Bunzl*, 155 S.W.3d at 210. Moreover, there is strong evidence that the

---

[4] Defendants have not produced from their files a single copy of the Settlement Agreement, much less a fully executed one, and Defendants have never claimed that the agreement was ever signed by Baker Hughes, Baker Petrolite or their attorney.

parties *did not* intend to be bound until both parties – and their attorneys – signed the agreement.

For example, the draft Settlement Agreement included four separate signature lines: (1) two signature lines for the parties, which when signed, would confirm "IN WITNESS WHEREOF" they have "approved and executed" the Agreement; and (2) two additional signature lines for their respective attorneys, which when signed, would confirm that the attorneys approved the agreement as to "form and substance." Defs. Ex. G at BHI014938. The fact that there are no signature lines on the draft for Baker Hughes or its attorney, despite the fact that they were sued and are named as parties to the Settlement Agreement in the first paragraph, evidences that this draft was not final, and that it had not yet been reviewed by Baker Hughes, who would have likely pointed out the deficiency. Moreover, there would be little reason to include any signature blocks, if the parties intended the draft agreement to be binding without signatures. *See Baier*, 420 S.W.3d at 739 ("[W]e are hard pressed to discern any purpose for placing a signature line for Darden … unless it was to require an authorized signature as a condition of mutual assent.").

Other language in the Settlement Agreement evidences that the parties did not intend to be bound to the draft agreement until they reviewed, considered, and signed the agreement. For example, the draft repeatedly refers to the "execution" of the agreement. *See* Defs. Ex. G ¶ 5 ("In consideration for the *execution* of this Release…"), ¶ 7 ("The undersigned further state … that they *execute* the same as their own free act and deed…"), ¶ 8 ("Stevens has been made aware of his right to consult an attorney about and *before executing* this Agreement…."), p. 5 ("the parties hereto and their respective attorneys have approved and *executed* this Agreement…") (emphases added). The draft further references the "*undersigned*" parties and the "*signing*" of the agreement. *See id.* ¶¶ 7, 8. Accordingly, the overwhelming evidence is that the parties did not

- 16 -

intend to be bound until the agreement was signed by <u>all three parties</u> and their attorneys. *See Wright v. Hernandez*, No. 08-14-00303-CV, --- S.W.3d.---, 2015 WL 4389582, at *10 (Tex. Ct. App. July 17, 2015) ("[W]hen the terms of a contract make it clear that a signature is required, a party's failure to sign the agreement will render the agreement unenforceable.").

### C.   Subsequent conduct reveals that none of the parties believed that Stevens was released from his confidentiality obligations.

The parties' conduct after settlement of the Oklahoma Bonus Lawsuit further demonstrates that the parties never intended or believed that Stevens was released from his confidentiality obligations. *See Worsham*, 552 S.W.2d at 371 (noting that the parties' subsequent conduct is probative on whether they assented to a contract); *Wright*, 2015 WL 4389582, at *12 ("[A] parties' intent to be bound by a contract may be evidenced by its conduct at the time a contract is drafted and by its subsequent conduct reflecting that it was acting in accordance with the terms of the contract.").

Plaintiffs have at all times undertaken significant efforts to protect the confidentiality of their trade secrets. Specifically to Stevens, such efforts include having Stevens sign two separate written agreements related to confidentiality. SOF 2, 4. The importance of confidentiality to Plaintiffs is evidenced by the fact that although the Termination Agreement separately required Stevens to agree to maintain the confidentiality of Plaintiffs' trade secrets, it also expressly provided that it did not supersede the prior Employee Agreement or its confidentiality provisions.

The trade secrets at issue in this case provide Plaintiffs with a competitive advantage worth millions of dollars in annual revenue. Woods Decl. ¶ 19. In light of the value of the trade secrets and Plaintiffs' undisputed and successful efforts to protect them for the last forty years, it is not logical to suggest that Plaintiffs would release Stevens from his confidentiality obligations,

thereby putting Plaintiffs' entire business at risk in connection with the settlement of a minor $10,000 payment dispute.

Since the date of the alleged settlement, the actions of both Plaintiffs and Defendant Stevens have been consistent with the fact that the parties never intended or agreed to release Stevens' confidentiality obligations.[5] For example, as discussed above, just two years after the parties settled the Oklahoma Bonus Litigation, Plaintiffs sent Stevens a letter reminding him of his continuing confidentiality obligations. SOF 12. This letter is completely inconsistent with the alleged intent to release Stevens two years earlier.

Likewise, Stevens did not reference the alleged release in any response to the Baker Petrolite letter, or otherwise claim that he was released from his confidentiality obligations. SOF 13. If Stevens truly intended and believed that he had a release, he would have promptly responded that those obligations were extinguished. Defendants have not presented any evidence that Stevens ever argued, in response to the February 2002 letter, that he was released.

To the contrary – the evidence is that Stevens did not believe at the time he received the 2002 letter that Petrolite had released him. *Id*. At some point after receiving the letter, Stevens consulted a lawyer, Brent P. Johnson with Sheridan Ross, concerning his continuing confidentiality obligations. *Id*. Tellingly, the Stevens' letter to the lawyer made no reference to the Settlement Agreement, or any release. *Id*. Clearly, if Stevens had believed that the parties had negotiated a release, he would have made that known to his lawyer and provided the lawyer with

---

[5] Contrary to Defendants' claim, Baker Petrolite's issuance of a $10,000 check and Stevens' dismissal of the Oklahoma suit do not demonstrate that the parties had a "meeting of the minds" on the release. At best, these facts suggest only that Baker Petrolite was willing to pay Stevens $10,000 in exchange for Stevens' dismissal, and Stevens was willing to dismiss in exchange for the payment, since the case was dismissed without Stevens ever receiving an executed Settlement Agreement from Baker Hughes or Baker Petrolite. Indeed, the overwhelming evidence demonstrates that none of the parties believed they had agreed to the release.

a copy of the Settlement Agreement. But, there is no evidence that Stevens ever told his attorney about the alleged release or the Settlement Agreement. *Id*. This reveals that Stevens never intended to obtain a release of confidentiality in connection with the settlement negotiations in 2000 and had no reason to believe that he had one, which he did not as evidenced by the fact that he never received a signed copy from Plaintiffs.

Thereafter, in 2008 and 2013, Stevens acknowledged that certain of the technologies he claimed were developed by his company may be subject to a claim by Plaintiffs. In February 2008, Stevens entered into a sales transaction related to his company and its technology. SOF 14. Stevens disclosed in the 2008 Closing Documents that technology may be subject to a claim by Baker Petrolite. *Id*. If Stevens had intended and believed that he had obtained a release of confidentiality in the draft Settlement Agreement, he would not have suggested in the Closing Documents that these technologies were subject to a potential claim.

Similarly, in 2013, Defendants began negotiating with a potential toll manufacturer for SPE. SOF 15. As part of that transaction, there was also a discussion of a potential claim to the technology by Baker Petrolite. *Id*. If Stevens intended and believed that he had obtained a release in 2000, surely there would have been some reference to that release in documents, but there is not.

In fact, Stevens never claimed at any point in time following the settlement until this litigation that he had been released of his confidentiality obligations under the employment agreements. The first time Stevens claimed he had been released from confidentiality was in May 2015 in response to Plaintiffs' Second Amended Complaint. SOF 16-17.

**D.    Defendants' "evidence" does not prove that Plaintiffs assented to a release.**

Defendants ignore the evidence, and instead contend that an alleged facsimile

transmission of a draft agreement constitutes a formal offer capable of acceptance. Defs. Br. § I, ¶¶ 11-12. It was not. As a threshold matter, the fax coversheet associated with the draft agreement cited by Defendants shows only that a version of the draft agreement may have been transmitted from Baker Petrolite's outside counsel to Baker Petrolite on or about April 7, 2000. Defs. Ex. G at BHI014934. It does not show whether it was being sent for purposes of further negotiation and discussion of the proposed terms and does not evidence that Petrolite had in fact assented to all of its terms. Indeed, contrary to Defendants' allegation, the fax does not evidence that Baker Petrolite's counsel faxed this same version of the agreement to Stevens on March 30, 2000. SOF 10.

Even if Baker Petrolite had transmitted this version of the agreement to Stevens, that is irrelevant in the absence of evidence of assent to the terms, because "[n]egotiations or preliminary steps toward a contract do not themselves constitute a contract." *Arndt*, 102 S.W.3d at 575 (citing *L.B. v. State Comm. of Psychologists*, 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)). Defendants' self-serving characterization of the draft as a "final" offer is inapposite. "Contract formation depends on what is actually said and done, not upon the understanding or supposition of one of the parties." *Arndt*, 102 S.W.2d at 575.

Defendants contend that Stevens' "acceptance" of the draft is sufficient to evidence consent (at least under Oklahoma law). Defs. Br. 10. (citing *Redwine Res., Inc. v. Predator Techs., LLC*, 171 P.3d 330 (Okla. Ct. App. 2007)). But they are wrong about the law in Oklahoma (and also in Missouri and Texas), which all require mutual assent. Even *Redwine,* cited by Defendants, makes clear that consent must "***mutual"*** and **"*communicated*,"** and that "[c]onsent is not mutual unless the parties *all* agree upon the same thing in the same sense." *Redwine*, 171 P.3d at 334 (emphases added). Here, there is simply no evidence that Baker

Hughes or Baker Petrolite agreed to the terms of this draft of the Settlement Agreement, let alone the release that is contrary to Plaintiffs' consistent conduct of protecting its valuable trade secrets. SOF 1-2, 4, 10.

Even assuming Defendants' theory that Baker Petrolite transmitted an "offer" was correct (and it is not), it is not self-evident that a bilateral contract is formed when an ***offeree*** signs an ***unsigned*** draft proposal. *See Baier*, 420 S.W.3d at 739. "Rather, the absence of the offeror's signature on the proposal presents a ***question of fact***, requiring the trial court to determine the offeror's intent, *i.e.*, whether an 'offer' to enter into a bilateral contract was made, and thus whether the offeror intends to be bound if the unsigned proposal is accepted by the offeree." *Id.* (emphasis added). Questions as to the parties' intent are for the jury to resolve.

### E.     Settlement Agreement is invalid under the Statute of Frauds.

The draft Settlement Agreement is invalid under the statute of frauds because it is a written contract that cannot be performed within a year from its "making" and it has not been subscribed to by Plaintiffs.  *See* Mo. Ann. Stat. § 432.010 (2015); Ok. Stat. Ann. tit. 15, § 136 (2015); Tex. Bus & Com. Code Ann. § 26.10 (2015).  Specifically, the draft release purports to release Stevens of claims that Plaintiffs may have had against Stevens up to the date of the agreement – including, according to Defendants, Plaintiffs' claim for breach of the Termination Agreement.  SOF 10; Defs. Br. 13-14.  The release of a claim for breach of the Termination Agreement is incapable of being performed within one year.  Indeed, a release is, in effect, an agreement not to sue.  The earliest a claim for breach of the Termination Agreement could arise is November 22, 1996 (its execution date), and the Missouri statute of limitations for such a claim is five years.  *See* Mo. Ann. Stat. § 516.120 (2015); SOF 7 (noting that Missouri law applies to Termination Agreement).  An agreement not to sue on this claim can be fully

performed only by refraining from suit for the full 5-year statute of limitations period – *i.e.*, until November 22, 2001 – which is more than one year from the alleged "making" of the draft Settlement Agreement (March 30, 2000). *See Bird v. Bilby*, 202 Mo. App. 212, 910-11 (Mo. Ct. App. 1919) (considering statute of limitations in evaluating whether agreement not to sue violates statute of frauds).

"Partial performance" is an equitable exception to the statute of frauds, but it "is rigidly scrutinized and sparingly invoked; relief will be denied if there is doubt as to whether there has been a meeting of the minds or full understanding of the terms sought to be enforced." *Johnson v. Cook*, 167 S.W.3d 258, 264 (Mo. Ct. App. 2005). In order for the exception to apply, the partial performance must be "unequivocally and exclusively referable to the contract and must have been done in pursuance of the contract so as to result therefrom and not from some other relation." *Alonzo v. Laubert*, 418 S.W.2d 94, 97 (Mo. 1967). Defendants have failed to establish that the exception applies. *See Bookout v. Bookout*, 165 S.W.3d 904, 908 (Tex. Ct. App. 2005) ("Generally, the party claiming an exception to the statute of frauds must secure a finding to that effect."). Indeed, Baker Petrolite's issuance of a $10,000 check and Stevens' dismissal of the Oklahoma litigation do not demonstrate that the parties had a "meeting of the minds" on the release, and Defendants have not shown that these acts are "unequivocally and exclusively referable" to the draft agreement and "done in pursuance of the contract." In fact, the evidence suggests otherwise. Stevens dismissed the lawsuit after receiving the $10,000 payment without ever receiving an executed Settlement Agreement from Baker Hughes or Baker Petrolite, and there is simply no evidence demonstrating that the parties assented to the terms of the release.

## III.     Settlement Agreement Does Not Release Stevens Of Common Law Obligations.

Defendants contend that the Settlement Agreement discharged Stevens of Plaintiffs'

agreements and contracts, and therefore, the confidentiality provisions of these agreements no longer apply. *See* Defs. Br. 15. According to Defendants, since Stevens was allegedly released from the written confidentiality provisions of his prior agreements, it follows that Plaintiffs no longer have a trade secret in any information disclosed to Stevens. Defendants' argument is wrong because it ignores Stevens' well-recognized common law duty to maintain Plaintiffs' trade secrets and confidential information. It is settled law that an employee's obligation to maintain his employer's trade secrets and confidential information is not dependent upon the existence of a confidentiality agreement. *See Snepp v. United States*, 444 U.S. 507, 515 n.11 (1980) ("[E]ven in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment."); *A.B. Chance Co. v. Schmidt*, 719 S.W.2d 854, 859 (Mo. Ct. App. 1986) ("Whether or not an agreement existed, the [employer] had a common law right in the trade secrets imparted to the employee during a confidential relationship…."). "Absent an agreement specifically prohibiting disclosure of trade secrets, [employee] would be prohibited by the common law from disclosing trade secrets." *Hayes-Albion v. Kuberski*, 421 Mich. 170, 181, 364 N.W.2d 609, 614 (1984) .

By virtue of his trusted position within Petrolite, Stevens was provided with and was in charge of using extensive confidential, proprietary trade secret information. SOF 2-3. Stevens gained intimate knowledge of the EP Processes through his position within Petrolite, including the key chemical components used in the EP Processes. *Id*. Stevens was fully aware at all times that he was not authorized to misuse this information or disclose it to others. Ex. D to Opp. MSJ-TS 73:5-12.

Stevens' trusted employment relationship with Petrolite gave rise to a duty to maintain the secrecy of Petrolite's confidential and trade secrets information. *See Pony Computer, Inc. v.*

*Equus Computer Sys. of Mo., Inc.*, 162 F.3d 991, 997 (8th Cir. 1998) ("A confidential

relationship between employer and employee giving rise to fiduciary duties exists if (1) there is

an express understanding that the employee is receiving confidential information, or (2) the

employee acquired the information in such a way that he must have known of its confidential

nature.") (citing *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 35–36 (Mo. 1966) (en banc)).

Thus, even if the release contained in the Settlement Agreement discharged Stevens' obligations

under the confidentiality provisions of his employment agreements (which is denied), it had no

effect on Stevens' common law duty to maintain the trade secrets and confidential information of

his employer. *See Hayes-Albion*, 421 Mich. at 181, 364 N.W.2d at 614. Because Stevens' duty to

maintain Plaintiffs' trade secrets never lapsed, Plaintiffs' trade secrets have not lost their trade

secret status as to Stevens.

**IV.     Court Should Strike And Disregard Giles Affidavits And Billing Records.**

The Court should strike and disregard the two Giles Affidavits and the billing records

attached to it, Defs. Ex. B, C, and Doc. No. 238, and any arguments in Defendants' motion

derived from them. As a threshold matter, Defendants never identified Giles during discovery as

a person with relevant knowledge, and therefore, Plaintiffs have been unfairly deprived of the

opportunity to obtain discovery from him and his law firm concerning his testimony.

Moreover, Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or

oppose a motion must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Giles' affidavits do not satisfy these requirements. Defs. Ex. B; Doc. No. 238; *Briggs v. Miles*,

No. 1:13-cv-228, 2015 WL 1120132, at *1, *7 (W.D. Mich. Mar. 12, 2015) (Neff, J.) (attached

as Ex. N). First, Giles' affidavits are not squarely based on personal knowledge. Indeed, Giles

testifies only *"[o]n information and belief and to the best of [his] knowledge"* that the parties

performed the contract. Defs. Ex. B ¶ 10 (emphasis added). Moreover, whether or not the parties

"performed" is not a fact, but rather an unsupported, conclusory, and thinly-veiled legal opinion,

as is Giles' opinion in paragraph 10 (Doc. No. 238) that the document that he self-servingly calls

"the Final Agreement" constituted "an offer that was accepted by Bruce Stevens by signing and

returning the agreement…". Giles has not been designated or qualified as a legal expert in this

case, and this specific testimony should be disregarded. Finally, Giles' affidavits purport to

attach (and presumably admit) billing records upon which he claims to rely to "refresh [his]

recollection of the events surrounding the Final Agreement." Defs. Ex. C; Doc. No. 238. The

billing records should be struck and disregarded on the grounds that (1) they were never

produced in discovery and they have not been properly authenticated under FRE 901, and (2)

they constitute inadmissible hearsay under FRE 801-802. Defendants are offering the billing

records for the truth of what their narratives assert to support their after-the-fact allegations

regarding the events surrounding the settlement of the Oklahoma litigation. Defendants have not

demonstrated that the records qualify for any hearsay exception under Rule 803.

## <u>CONCLUSION</u>

Defendants have not established that there are no material facts in dispute regarding their

defense of release. When viewed in the light most favorable to Plaintiffs as the nonmoving party,

including taking all reasonable inferences in favor of Plaintiffs, the evidence demonstrates that

the Settlement Agreement did not release Stevens from his obligations under the Termination

Agreement, the Employee Agreement, or the common law. Thus, Defendants' motion should be

denied in its entirety.

Respectfully submitted by:

Date:  September 21, 2015

*/s/ John H. Barr, Jr.*

John H. Barr, Jr.
Abby L. Parsons
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Tel: 713.276.7369

David W. Centner (P43071)
CLARK HILL PLC
200 Ottawa Avenue NW, Ste. 500
Grand Rapids, MI 49503
Tel: 616.608.1100

**ATTORNEYS FOR PLAINTIFFS**

**BAKER HUGHES INCORPORATED AND BAKER PETROLITE CORPORATION**