UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAKER HUGHES, INC. and
BAKER PETROLITE, LLC,

        Plaintiffs,

                                      File No. 1:14-cv-531

v.

                                       HON. ROBERT HOLMES BELL

S&S CHEMICAL, LLC, BRUCE NEAL
STEVENS, and SPE WAX TECHNOLOGIES,
LLC,

        Defendants.

_____/

## **O P I N I O N**

       This is a trade secret and breach of contract case filed pursuant to Michigan's Uniform

Trade Secrets Act and Oklahoma state law. The matter is presently before the Court on

Defendants' Motion for Summary Judgment–Release Agreement (ECF No. 218). Plaintiffs

have filed a response (ECF No. 263), to which Defendants filed a reply (ECF No. 293).[1] For

the reasons that follow, Defendants' motion will be granted.

---

    [1]Defendants have also filed a motion for summary judgment based on the statute of
limitations (ECF No. 203) and a motion for summary judgment arguing that no misappropriation of
trade secrets occurred (ECF No. 220). Plaintiffs filed responses to these motions (ECF Nos. 269,
250), to which Defendants filed replies (ECF Nos. 317, 319). Because this motion for summary
judgment results in the dismissal of Plaintiffs' claims in their entirety, the Court will not address the
other motions.

**I.**

Plaintiffs Baker Hughes, Inc. and Baker Petrolite, LLC (hereinafter "Baker") claim to own trade secrets related to ethylene polymerization processes (EP Processes). Baker asserts that it uses its EP Processes to produce POLYWAX™ and PERFORMALENE™ polyethylenes, UNILIN™ and PERFORAMCOL™ alcohols, and PETROLITE™ copolymers. (First Am. Compl. ¶ 8, ECF No. 22.) Baker alleges that the secrecy of its EP Processes is a key to its success, as the products using its EP Processes have been on the market for over forty years, and no other company has been able to provide a comparable product at the same price or quality. (*Id.* at ¶ 9.)

Defendant Bruce Stevens began working at Baker's predecessor, the Petrolite Corporation, in 1989. His position made him privy to much of Petrolite's confidential information, particularly related to its EP Processes. On July 17, 1989, Stevens signed an Employee Agreement (Employee Agreement, ECF No. 263-1), forbidding Stevens from disclosing–either during or subsequent to his employment–confidential information relating to Petrolite's "business or technology." (*Id.* at PageID #5266.)

Stevens remained at Petrolite until 1996, when Petrolite terminated Stevens's employment and Stevens signed an Employee Termination Agreement ("Termination Agreement"). (ECF No. 218-1.) The Termination Agreement was subject to Missouri law. (*Id.* at PageID #3691.) The Termination Agreement contains its own provision forbidding

Stevens from disclosing any confidential information related to Petrolite's business or technology. (*Id.* at PageID #3689-90.)

In 1999, as part of an allegedly finalized settlement agreement ("Disputed Agreement"), Stevens and Baker released each other from any prior obligations and agreements between the two parties.

Around 1999, Stevens formed Defendant S&S Chemical ("S&S"). S&S has marketed a polyethylene product that directly competes with Baker's products. Baker alleges that S&S's product is manufactured using its proprietary EP Processes. Since 2004, S&S has produced only 40,000 pounds of competing product. Stevens and S&S contend that they began developing their EP Processes independently in 2002. Defendants present evidence from several scientists in their employ demonstrating that, in developing their own EP Processes, Defendants started from publicly available information, including U.S. patents, to develop products similar to Baker's. Stevens avers that he never shared any of Baker's proprietary information with the scientists working to develop these products.

Baker asserts that in 2012, "Stevens disclosed and, through his company S&S, sold [Baker's] confidential and proprietary Trade Secrets to SPE[,]" breaching Stevens's Termination Agreement. (First Am. Compl. ¶ 39.) Baker also asserts that Stevens, S&S, and SPE are liable for misappropriating Baker's trade secrets.

This motion for summary judgment centers on the Disputed Agreement's validity and effect on the obligations set forth in the Employee Agreement and Termination Agreement.

## A. Relevant Terms in Stevens's Agreements

### 1. The 1989 Employee Agreement

Stevens signed the Employee Agreement when he began his employment with the Petrolite Corporation. (Employee Agreement, ECF No. 263-1.)  The Employee Agreement contains a choice of law clause noting that its terms and conditions are governed by Missouri contract law. (*Id.* at ¶ 11.) The agreement contains a confidentiality clause, providing, in part:

> I shall not disclose to others not in the employ of the Company at any time, or with persons in the employ of the Company except on a need to know basis, either during or subsequent to my employment, any information, knowledge, or data which may have been received, learned, obtained, or developed by me . . . during the course of my employment which relate, either directly or indirectly, to the Company's business or technology . . . .

(*Id.* at ¶ 3(a).) The agreement states that the confidentiality clause "shall survive and continue in full force and effect after termination of [Stevens's] employment for any reason." (*Id.* at ¶ 3(c).) The agreement further states that "[t]his Agreement may not be changed or modified, abandoned, in whole or in part, except in writing and signed by all parties to this Agreement." (*Id.* at ¶ 9.)

### 2. The 1996 Termination Agreement

In 1996, when Stevens was terminated from Petrolite, he signed the Termination Agreement, releasing Petrolite from any claims connected to Stevens's employment relationship with Petrolite in exchange for certain benefits. (Termination Agreement, ECF No. 218-1.) This agreement also contained a Missouri choice of law provision. (*Id.* at ¶ 9.) The agreement "supersede[d] any and all agreements" that existed between Petrolite and

4

Stevens (*Id.* at ¶ 4), but did not alter previous agreements setting forth "specific obligations of the employee including the Disclosure and Processing of Inventions, the Possession and Surrender of Company Information, and certain actions by the Employee following his/her termination." (*Id.* at ¶ 6.) The Termination Agreement also contained a confidentiality clause similar to that set forth in the Employee Agreement. (*Id.* at ¶ 5.)

### 3. The 1999 Disputed Agreement

On October 18, 1999, Stevens filed a complaint against Baker in Oklahoma state court unrelated to this case. (ECF No. 218-4, PageID #3705.) The complaint alleged that Baker breached a contract by not paying Stevens bonus compensation that he was owed. (*Id.*) Baker removed the case to the United States District Court for the Northern District of Oklahoma. (ECF No. 263-3, PageID #5283.) As part of ongoing settlement discussions relating to the case, numerous draft settlement agreements were sent between Stevens and Baker. The last draft of the agreement (the "Disputed Agreement") that either party possesses is dated March 31, 2000.

The Disputed Agreement contains no choice of law provision and, importantly, does not contain a confidentiality clause. The agreement does, however, contain a general release, which states:

> Except for the obligations set for[th] in this Agreement, as of the date of this Agreement, Baker hereby fully and forever remises, releases and discharges Stevens and his attorneys, agents, heirs, executors, administrators, predecessors, successors and assigns (collectively referred to as the "Stevens Release Parties"), of and from any and all claims, demands, agreements, contracts, covenants, suits, actions, causes of action, obligations, controversies,

debts, costs, expenses, damages, judgments, losses and liabilities, of whatever kind or nature, in law, equity or otherwise, whether known or unknown, concealed or hidden, against any of the Stevens Released Parties which Baker has had, may have had or now has, to and including the date of this Agreement.

It is the intention of the parties to this Agreement that the foregoing general releases shall be effective as a bar to all actions, causes of action, suits, claims or demands of every kind, nature or character whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, referred to above . . . .

(Disputed Agreement ¶ 1, ECF No. 218-7.) The agreement further states that "[t]he terms and conditions set out above are in complete and final settlement of disputed claims, the existence or occurrence of which is expressly denied by Baker." (*Id.* at ¶ 3.) The agreement required Baker to pay $10,000 to Stevens in exchange for Stevens's dismissal of the pending case in the Northern District of Oklahoma. A $10,000 check was sent to Stevens on April 4, 2000, and the case was dismissed with prejudice on April 19, 2000. The agreement contained four signature blocks: one for Stevens, one for Stevens's attorney Robert W. Giles, one for a Baker employee, and one for Baker's attorney Steven A. Broussard. Only Stevens and Giles signed the agreement.

This case turns on whether the Disputed Agreement was finalized and binding.

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Oh. Citizen Action v. City of Englewood*, 671 F.3d 564, 569–70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson*, 477 U.S. at 252. The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

Plaintiffs have brought two substantive claims[2] against Defendants: (1) misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act, and (2) breach of Stevens's Termination Agreement. (First Am. Compl. ¶¶ 30-40.) Defendants argue that neither claim has merit due to the effect of the Disputed Agreement.

#### A. The Effect of the Employee Agreement

Baker first argues that the Disputed Agreement could not have released Stevens's confidentiality obligations set forth in the Employee Agreement because the Employee Agreement "states that Stevens' non-disclosure obligations survive and continue in full force after termination and that the agreement 'may not be changed or modified, [or] abandoned, in whole or in part, except in writing and signed by all parties to this Agreement.'" (Pls.' Resp. to Defs.' Mot. Summ. J. 9, ECF No. 263, PageID #5241.) Baker argues that the Employee Agreement was incorporated into the Termination Agreement, and that the Employee Agreement "remained in full force and effect following execution of the Termination Agreement." (*Id.* at 10.) Therefore, even after the Termination Agreement went into effect, any change, modification, or cancellation to the Employee Agreement needed to have been "in writing and signed by all parties."

---

[2]Plaintiff's complaint also brought forth a claim that both the discovery rule and fraudulent concealment tolled the statute of limitations. The Court dismissed this claim because the allegations did not support an independent cause of action. (Opinion at 8, ECF No. 54.)

Both the Employee Agreement and Termination Agreement are governed by Missouri law. Missouri courts have addressed clauses mandating a signed writing to change or modify terms of a contract. In *Doss v. EPIC Healthcare Management Co.*, 901 S.W.2d 216, 219 (Mo. Ct. App. 1995), a clause in a lease agreement provided that "the lease may 'only be modified, extended or renewed by a writing signed by the parties hereto.'" *Id.* at 221. The court stated that Missouri law:

> has held that such provisions do not prevent the parties from effecting modifications by valid contractual formalities, even though there is no writing. The parties to a contract may agree between themselves that the contract is to be cancelled or rescinded, and *the only formalities required are those ordinarily attending the making of contracts.*

*Id.* (citing *Fritts v. Cloud Oak Flooring Co.*, 478 S.W.2d 8, 14 (Mo. Ct. App. 1972); 3A Corbin on Contracts, § 763, p. 531) (emphasis added). Similarly, in *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 534-35 (Mo. Ct. App. 2011), the court addressed a clause stating that an employment agreement "may only be amended or modified by a subsequent written agreement[.]" The court noted that "Missouri law is well-established that 'no oral-modification' clauses have no preclusive effect when the parties engage in modification by valid contractual formalities." *Id.* at 535 (citing *Fritts*, 478 S.W.2d at 14).

Accordingly, so long as the Disputed Agreement was entered into using valid contractual formalities, the existence of a clause in the Employment Agreement requiring modifications or cancellations to be signed and in writing does not preclude modification or

rescission of the terms–including the confidentiality obligations–set forth in the Employment Agreement.

## B. Validity of the Disputed Agreement

Defendants assert that the Disputed Agreement was sent by Baker as a finalized offer to Stevens for Stevens's acceptance. Baker, on the other hand, argues that the Disputed Agreement was merely a draft, and notes that "[t]here is no evidence that [Baker] ever agreed to the terms of the draft settlement, let alone the language of the release." (ECF No. 263, PageID #5251.)

### 1. Choice of Law

The Disputed Agreement does not specify which state's law governs its validity or effect. To determine whether the Disputed Agreement was in fact a binding contract, the Court must first determine which state's law to apply.

In diversity cases, this Court applies "the substantive law of the state in which the court sits." *Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64. 78 (1938)). "This rule extends to the forum state's law regarding choice of laws." *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Accordingly, the Court applies Michigan's choice of law rules.

The question of whether Baker entered into the Disputed Agreement is a question of contract law. *See Bamerilease v. Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992). In contract disputes, Michigan courts look to sections 187 and 188 of the Second

10

Restatement of Conflict of Laws. *See Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528

N.W.2d 698 (Mich. 1995). Section 188 governs in the absence of a choice of law agreement

between the parties. Section 188(2) provides:

> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place of contracting,
> > (b) the place of negotiation of the contract,
> > (c) the place of performance,
> > (d) the location of the subject matter of the contract, and
> > (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188. Section 6, referred to in Section 188(2),

provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> > (b) the relevant policies of the forum,
> > (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> > (d) the protection of justified expectations,
> > (e) the basic policies underlying the particular field of law,
> > (f) certainty, predictability and uniformity of result, and
> > (g) ease in the determination and application of the law to be applied.

*Id.* at § 6. "The importance of the contacts listed in section 188 . . . are illuminated by the principles in section 6." *Meijer, Inc. v. General Star Indem. Co.*, No. 94-1152, 1995 WL 433592, at *4 (6th Cir. July 21, 1995).

The contacts listed in Section 188(2) favor application of Oklahoma law to the Disputed Agreement. As Baker asserts that the contract was not entered into at all, the place of contracting is not clear. The record does demonstrate, however, that Stevens and his attorney were located in Oklahoma at the time of contracting, and that the attorney representing Baker, Steven Broussard, was an attorney at an Oklahoma law firm. If a contract was entered into, it was likely done so in Oklahoma. If a contract was not entered into, the place of the negotiation of the contract was likely in Oklahoma. The place of performance of the agreement and the subject matter of the agreement also favor application of Oklahoma law: at the heart of the Disputed Agreement was an agreement that Stevens would dismiss a lawsuit pending in the Northern District of Oklahoma, and that Baker would send a check to Stevens, who was living in Oklahoma. Stevens dismissed the suit in the Northern District of Oklahoma, and a check was sent to him. The fifth factor–the domicil, residence, place of incorporation, and place of business of the parties–favors application of both Texas (Baker's place of business) and Oklahoma (Stevens's residence) law.

While Baker argues that failure to apply Missouri law "will significantly undermine the justifiable expectation of Petrolite and its successor-in-interest, Baker Hughes, that the law of a single forum (Missouri) shall govern the interpretation of its employment

agreements," (ECF No. 263, PageID #5249), the contract at issue is a settlement agreement tailored specifically to Stevens, not a generic employment agreement. Further, while Baker argues that reliance on Missouri law is reasonable because "Petrolite's headquarters were located in Missouri at the time the parties entered into the Termination Agreement and during the course of Stevens' seven years of employment," at the time the Disputed Agreement was executed, Baker was headquartered in Texas, not Missouri.

Accordingly, the Court will apply Oklahoma contract law to determine whether the Disputed Agreement is binding.

### 2. Oklahoma Contract Law

Baker argues that the Disputed Agreement is not a binding contract. At issue is whether the Disputed Agreement was a properly formed contract and, if so, what effect the terms of the Disputed Agreement have on earlier agreements.

### a. Contract Formation

In Oklahoma, "[t]he four elements necessary to have a binding contract are competent parties, consent, a legal object and consideration." *Intercon Mfg., Inc. v. Centrifugal Casting Mach. Co., Inc.*, 875 P.2d 1149, 1152 (Okla. Civ. App. 1993). "A settlement agreement . . . is subject to the rules of offer and acceptance and of mutual assent which control any issue of contract formation." *In re De-Annexation of Certain Real Property from City of Seminole*, 204 P.3d 87, 89 (Okla. 2009). "[T]he existence of a contract, and in particular 'whether the minds of the parties ever met in complete agreement,' is a question of fact." *GET, LLC v.*

13

*City of Blackwell*, 407 F. App'x 307, 309 (10th Cir. 2011) (quoting *Gomes v. Hameed*, 184 P.3d 479, 485 (Okla. 2008)). However, "the interpretation of a contract, and whether it is ambiguous is a matter of law for the Court to resolve." *Whitehorse v. Johnson*, 156 P. 3d 41, 47 (Okla. 2007).

The parties do not dispute that the parties involved were competent, that a legal object exists, or that consideration exists. Rather, the dispute relates to consent. "The consent of the parties to a contract must be: 1. Free, 2. Mutual, and 3. Communicated by each to the other." Okla. Stat. tit. 15, § 51 (2001). "In order to have a valid contract there must be mutual consent, or a meeting of the minds." *Beck v. Reynolds*,  903 P.2d 317, 319 (Okla. 1995) (citing Okla Stat. tit. 15, §§ 2, 66). "'[C]onsent is not mutual unless the parties all agree upon the same thing in the same [sense].'" *Id.* (quoting *Smalley v. Bond*, 218 P. 513, 515 (Okla. 1923)).

Baker does not argue that the terms of the Disputed Agreement are ambiguous or that a mistake of fact or fraud occurred. Baker instead argues that the Disputed Agreement as written was never meant to be a finalized agreement between Baker and Stevens, and therefore mutual assent did not exist between the parties. Defendants, however, argue that on March 30, 2000, the Disputed Agreement was sent to Defendants by Baker as a finalized offer. Because Defendants signed the agreement that was offered by Baker, and because each party performed the terms of the contract, Defendants argue that mutual assent existed.

14

Defendants have presented evidence that the Disputed Agreement was sent to Defendants by Baker and was intended to be a final offer. Defendants have presented a sworn declaration from Stevens's attorney at the time the Disputed Agreement was allegedly entered into, Robert W. Giles.[3] Giles testified that Steven A. Broussard, Baker's attorney at the time, sent "the final version of the settlement agreement" to him on or around March 30, 2000. (Giles Decl. ¶ 9, ECF No. 218-2.) Giles states that "[t]he Final Agreement that my office received from Broussard on or around March 30, 2000, was an offer that was accepted by Bruce Stevens on April 7, 2000." (*Id.* at ¶ 10.) Giles's billing records demonstrate that on March 30, 2000, he "[r]eview[ed] final draft of Sett[le]ment Agreement and Full an[d] Final

---

[3]Baker asserts that the Court should strike and disregard the Giles affidavit and his billing records because: (1) Defendants did not identify Giles during discovery as a person with relevant knowledge, (2) the Giles affidavit violates Federal Rule of Civil Procedure 56(c)(4) because it is not based on personal knowledge, (3) whether or not the parties "performed" is "an unsupported conclusory, and thinly-veiled legal opinion" that a non-expert may not make, (4) the billing records have not been properly authenticated, and (5) the billing records are inadmissible hearsay. (ECF No. 263, PageID #5262.) Defendants assert that Giles was not identified during Defendants' Rule 26 disclosures because they did not become aware of the Disputed Agreement and Giles's involvement until Baker produced a copy of the agreement during discovery.

Baker is mistaken that the affidavit is not based on personal knowledge. The affidavit explicitly states "My name is Robert W. Giles and I have personal knowledge of the facts stated herein." (Giles Decl. ¶ 1, ECF No. 218-2.) Giles's assertion that he "received from Steven A. Broussard the final version of the settlement agreement" is a statement of fact, not law. Other evidence exists indicating that the parties performed.

Baker's evidentiary objections also have no merit. In a motion for summary judgment, "[t]he proffered evidence need not be in admissible form, but its content must be admissible." *Perry v. Jaguar of Troy*, 353 F.3d 510, 516 n.3 (6th Cir. 2003) (citing *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)). The Court finds that the billing records are capable of authentication under Federal Rule of Evidence 901(b)(1), and that Giles could demonstrate that the content of the billing records is admissible under Rule 803(6). Accordingly, the Court will consider the Giles Declaration and billing records.

Release of Claims. All changes made." (Ex. C, ECF No. 218-2.) Defendants have also shown that both parties have performed their obligations under the Disputed Agreement: Baker paid Stevens $10,000 and Stevens dismissed the case. (Baker Check, ECF No. 218-9; Stevens Motion to Dismiss, ECF No. 218-9.)

Defendants have satisfied their burden of proving that on March 30, 2000, Baker sent the Disputed Agreement to Stevens, intending it to be a final offer, and that Stevens accepted the offer when he sent it back signed. The burden thus shifts to Baker to bring forth evidence showing that there is a genuine issue of material fact as to whether the agreement was made. *Celotex*, 477 U.S. at 324–25.

Baker has not brought forth evidence sufficient to create a genuine issue of material fact. Baker relies heavily on the fact that the Disputed Agreement contains four signature blocks: one for Stevens, one for Giles, one for a Baker employee, and one for Broussard. The Disputed Agreement was only signed by Stevens and Giles. Baker notes that "there would be little reason to include any signature blocks, if the parties intended the draft agreement to be binding without signature." (Pls.' Resp. to Defs.' Mot. Summ. J. at 26, ECF No. 263.) Baker further argues that other language in the Disputed Agreement itself demonstrates that the parties did not intend to be bound by the Disputed Agreement until it was signed–for instance, the Disputed Agreement repeatedly refers to the "execution" of the agreement and notes that "the *undersigned* further state" that they have read and understand the contents of the agreement.

In Oklahoma, it is not necessary that the offeror sign the finalized offer in order to create a binding contract. *See Stewart v. Bd. of Educ., Sch. Dist. No. 2, Stephens Cnty.*, 230 P. 504, 505 (Okla. 1924). "A contract signed by but one of the parties thereto is binding upon both, when acts thereunder have been performed by both parties[.]" *Id.* (internal citations and quotation marks omitted).

Although Baker did not sign the Disputed Agreement, the terms of the agreement were performed. Baker has not provided an affidavit from Broussard stating that the Disputed Agreement was not a finalized agreement. Baker has not shown any evidence that further negotiations occurred after March 30, 2000, or that the Disputed Agreement was just a draft. Baker's in-house counsel at the time of the Disputed Agreement, Stephen Littlefield, stated:

> Q: So, your testimony is that you acknowledge that some agreement was entered into, you just don't know what the agreement was?
>
> A: Yes.
>
> ****
>
> Q: So, you're saying that there could have been a–a different agreement and it may have been just an oral agreement. Is that what you're saying?
>
> A: Yes, could have been a handshake across the table. "You go away, here's your $10,000."
>
> Q: Do you have any factual support for that being the case in this situation with Mr. Stevens?
>
> A: No.

17

(Littlefield Dep. at 52-54, ECF No. 218-8.) Simply put, Baker has offered nothing but speculation to show that the Disputed Agreement was not a finalized offer. Consequently, the Court is satisfied that the Disputed Agreement is binding on both Baker and Stevens.

### b. Contract Interpretation

Because the Disputed Agreement is binding on both parties, the Court must determine the effect of the agreement's language. The Disputed Agreement explicitly states that Baker:

> [F]ully and forever remises, releases and discharges Stevens . . . of and from any and all claims, demands, *agreements, contracts*, covenants, suits, actions, causes of action, *obligations, controversies . . . of whatever kind or nature*, in law, equity or otherwise, *whether known or unknown*, concealed or hidden, against any of the Stevens Released Parties which Baker has had, may have had or now has, to and including the date of this Agreement.

> It is the intention of the parties to this Agreement that the foregoing general releases shall be effective as a bar to all actions, causes of action, suits, claims or demands of every kind, nature or character whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, referred to above . . . .

(Disputed Agreement ¶ 1, ECF No. 218-7) (emphasis added).

In arguing that no mutual assent existed, Baker alleges that the subsequent conduct of the parties reveal that neither Baker nor Stevens believed that Stevens was released from his confidentiality obligations. In 2002, two years after the date that the Disputed Agreement was allegedly finalized and allegedly released Stevens of his confidentiality obligations, Baker sent Stevens a letter "to remind you that you are obligated to protect the confidentiality of this [confidential information and trade secrets owned or possessed by Baker] even after your employment with the company has ended." (ECF No. 263-12, PageID #5337.) In

18

response, Stevens contacted his attorney, but never mentioned that he was released from his confidentiality obligations. Baker argues that this behavior is inconsistent with Stevens's assertion that the parties had finalized the Disputed Agreement and that Baker had released Stevens from his confidentiality obligations. Baker also points to other instances where "Stevens acknowledged that certain of the technologies he claimed were developed by his company may be subject to a claim by [Baker]." (ECF No. 263, PageID #5256.)

Baker's argument as to the parties' subsequent conduct relates to the intent of the parties rather than the existence of the contract. The language in the Disputed Agreement is unambiguous, however, so the Court will consider only the language itself in determining the intent of the parties. *See Whitehorse*, 156 P.3d at 47 ("Contractual intent is determined from the entire agreement. If a contract is complete in itself and viewed in its entirety is unambiguous, its language is the only legitimate evidence of what the parties intended.").

The language in the Disputed Agreement unambiguously released Stevens from any and all obligations he had to Baker, including his confidentiality obligations.

### 3. Statute of Frauds

Baker next argues that the Disputed Agreement is invalid under the statute of frauds because Baker did not sign the agreement and the agreement cannot be performed within a year from its making. Baker argues that "a release is, in effect, an agreement not to sue," and that this agreement not to sue could not be completed until the statute of limitations on the lawsuit ran.

In Oklahoma, "[a]n agreement that, by its terms, is not to be performed within a year from the making thereof" is invalid unless it is in writing and "subscribed by the party to be charged" or an agent or broker of the party. 15 Okla. Stat. Ann. § 136(1). Oklahoma courts, however, have distinguished release agreements from agreements not to sue. "A release intends a present abandonment of a known right or claim. A covenant not to sue, on the other hand, applies to future claims." *Cleveland v. Dyn-A-Mite Pest Control, Inc.*, 57 P.3d 119, 128 (Okla. Civ. App. 2002) (citations omitted).

The language in the Disputed Agreement "intends a present abandonment of a known right or claim." The agreement states that Baker "*releases and discharges* Stevens" from any claims "which Baker has had, may have had or now has, *to and including the date of this Agreement*." (Disputed Agreement ¶ 1, ECF No. 218-7) (emphasis added). Therefore, the release in the Disputed Agreement was performed upon acceptance, and the statute of frauds does not apply.

## D. Baker's Claims Do Not Have Merit

### 1. Breach of Termination Agreement

Baker argues that Stevens breached the Termination Agreement when he disclosed and sold Baker's confidential and proprietary trade secrets to SPE. For the reasons stated above, the Court finds that the Disputed Agreement released Stevens from any obligations contained in the Termination Agreement. Accordingly, Stevens is not liable for breaching the Termination Agreement.

Case 1:14-cv-00531-RHB   ECF No. 326 filed 10/20/15   PageID.7914   Page 21 of 23

## 2. Misappropriation

Baker claims that Stevens is liable for misappropriation of trade secrets because he disclosed Baker's trade secrets "that he acquired by improper means to S&S, SPE and others." (First Am. Compl. ¶ 33.) Baker claims that S&S and SPE are liable for misappropriation of trade secrets because they used Baker's trade secrets to manufacture a product to compete with Baker. (*Id.* at ¶ 34.) Baker asserts that S&S and SPE had reason to know Stevens improperly acquired knowledge of Baker's trade secrets. (*Id.* at ¶¶ 34, 35.)

Under MUTSA, misappropriation "means either of the following:"

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

> (A) Used improper means to acquire knowledge of the trade secret.

> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b). "'Improper means' includes theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." *Id.* § 445.1902(a).

There is no allegation that Stevens used theft, bribery, or misrepresentation to acquire or disclose trade secrets, and for the reasons stated, Stevens did not have, and thus did not breach, a duty to maintain the secrecy of Baker's information. Because Stevens did not acquire or disclose a trade secret by improper means, Stevens did not engage in misappropriation of trade secrets. Moreover, neither S&S nor SPE derived a trade secret "from or through a person who owed a duty to the person to maintain its secrecy or limit it use." *See* Mich. Comp. Laws § 445.1902(b)(ii)(B). Accordingly, Baker's misappropriation claim has no merit.

### 3. Common Law Duty

Lastly, Baker argues that the Disputed Agreement does not release Stevens of common law obligations to "not use a former employer's trade secrets or confidential information." (First Am. Compl. ¶ 33.)

MUTSA "displaces conflicting tort, restitutionary, and other law of [Michigan] providing civil remedies for misappropriation of a trade secret," Mich. Comp. Laws § 445.1908(1)(a), but does not displace "[o]ther civil remedies that are not based upon misappropriation of a trade secret," *id.* § 445.1908(2)(b). "In determining whether a claim is displaced by MUTSA, courts examine 'whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be dismissed.'" *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-cv-450, 2011 WL 4954061, at *2 (W.D. Mich. Oct. 17,

2011) (quoting *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003)).

While Baker does not explicitly state the common law duty of confidentiality that was breached, it cites two cases implicating fiduciary duties owed by former employees to employers. *See Pony Computer, Inc. v. Equus Computer Sys. of Mo., Inc.*, 162 F.3d 991, 997 (8th Cir. 1998); *Hayes-Albion v. Kuberski*, 421 364 N.W.2d 609, 614 (Mich. 1984). Both cases were decided before the enactment of the Uniform Trade Secrets Act. Because "claims of breach of a fiduciary duty owing to an employer premised on the misappropriation of trade secrets or confidential information are likewise preempted by the MUTSA," *Easton Sports, Inc. v. Warrior LaCrosse, Inc.*, No. 05-cv-72031, 2005 WL 2234559, at *3 (E.D. Mich. Sept. 14, 2005) (collecting cases), Baker's allegation that a breach of a common law duty occurred has no merit.

Even if Baker were able to show that a common law duty independent of the misappropriation of trade secrets existed, Stevens would not be liable given the general release in the Disputed Agreement, which released him of all "obligations . . . of whatever kind or nature, in law, equity or otherwise . . . ." (Disputed Agreement ¶ 1, ECF No. 218-7.)

## IV.

For the reasons stated above, the Court will grant Defendants' motion for summary judgment.

Judgment will enter in accordance with this Opinion.

Dated: October 20, 2015                    /s/ Robert Holmes Bell
                                           ROBERT HOLMES BELL
                                           UNITED STATES DISTRICT JUDGE